No. 119,070

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellant*,

v.

ESTEFANIA SALAZAR,
*Appellee*.


SYLLABUS BY THE COURT


1.

When reviewing a district court's decision on a motion to suppress evidence, an appellate court usually employs a bifurcated standard. The appellate court reviews the district court's factual findings for substantial competent evidence but does not reweigh evidence, resolve conflicting evidence, or reassess witness credibility. The district court's decision whether to suppress the evidence is a question of law subject to de novo review.


2.

The Fourth Amendment to the United States Constitution protects a person's right to be secure in his or her person and prohibits unreasonable searches by the government. Without a warrant, a search is unreasonable unless it falls within a recognized exception.


3.

The United States Supreme Court has held that a warrant is generally required before the search of a cell phone and that a cell phone, merely by virtue of its nature, is not exempt from the general warrant requirements.


1

4.

The plain view exception to the warrant requirement allows law enforcement officers to seize evidence of a crime without first obtaining a warrant when the evidence is in plain view of the officers performing lawful activities. In order for the plain view exception to apply, the officer must be lawfully present at the location at which he or she views the evidence, and the object's incriminating character must be immediately apparent without conducting some further search of the object.

5.

The exclusionary rule is a judicially created remedy that prohibits the introduction of evidence obtained in violation of a person's constitutional rights in order to deter future violations. The exclusionary rule encompasses both the primary evidence obtained as a direct result of an illegal search or seizure and evidence later discovered and found to be derivative of an illegality, the so-called fruit of the poisonous tree.

6.

One exception to the exclusionary rule is the doctrine of attenuation. Under the attenuation doctrine, the poisonous taint of an unlawful search or seizure dissipates when the connection between the unlawful police conduct and the discovery of the challenged evidence becomes attenuated.

7.

When evidence would not have come to light but for the illegal actions of the police, the relevant question is whether officers discovered the allegedly tainted evidence through exploitation of the illegal conduct or instead by means sufficiently distinguishable to be purged of the primary taint. Whether the taint of illegal police conduct has been sufficiently purged through attenuation is a question of fact that appellate courts review under a substantial competent evidence standard.

8.

Under an attenuation analysis, courts generally consider (1) the time that elapsed between the illegal police conduct and the acquisition of the evidence sought to be suppressed, (2) the presence of any intervening circumstances, and (3) the purpose and flagrancy of the official misconduct. No one factor is controlling, and other factors may also be relevant to the analysis.

9.

An unconstitutional seizure may infect or taint a consent to search as well as any fruits of a law-enforcement-citizen encounter if the nature of the seizure renders the consent to search involuntary. Conversely, a voluntary consent to search can purge the primary taint of an illegal seizure where the connection between the lawless conduct of the law enforcement officer and the discovery of the challenged evidence has become so attenuated as to dissipate the taint.

10.

Analysis of whether a person's consent was voluntary is crucial in determining whether the consent has sufficiently purged the taint of an illegal search or seizure. Generally, a valid consent requires:  (1) clear and positive testimony that consent was unequivocal, specific, and freely given; and (2) the absence of duress or coercion, express or implied.

11.

The determination of whether a consent to a search was in fact voluntary or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances.

12.

For a constitutional violation to be flagrant, more severe police conduct is required than the mere absence of proper cause for the seizure. In examining the flagrancy of official misconduct, factors such as an officer's regular practices and routines, an officer's reason for initiating the encounter, the clarity of the law forbidding the illegal conduct, and the objective appearance of consent may all be important in this inquiry.

Appeal from Montgomery District Court; F. WILLIAM CULLINS, judge. Opinion filed October 12, 2018. Reversed and remanded with directions.

*Steven J. Obermeier*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellant.

*Brian Piccolo Duncan*, of Brake and Duncan, LLC, of Yates Center, for appellee.

Before LEBEN, P.J., GREEN and MALONE, JJ.

MALONE, J.:  In this interlocutory appeal, the State argues that the district court erred by granting Estefania Salazar's motion to suppress the contents of her cellular phone seized by law enforcement after a fatality motor vehicle accident. The cell phone provided evidence that Salazar may have been texting at the precise moment that the accident occurred. The State argues that the law enforcement officer's initial search of the cell phone—conducted without consent and without a warrant—was legal under the plain view exception to the warrant requirement, but we reject that claim. The State also argues that the cell phone evidence is admissible under the attenuation doctrine because Salazar later consented to the search of her phone and the State obtained a search warrant for the phone. The district court rejected this argument. We make no final decision on whether the cell phone evidence is admissible. However, we remand for further proceedings to allow the district court to conduct the proper analysis under the attenuation doctrine and to reevaluate the admissibility of the cell phone evidence.

4

On June 21, 2016, at 7:40 a.m., law enforcement dispatch in Montgomery County received a call that a van had struck a motorcycle, causing the death of the motorcyclist, later identified as Brent E. Kretzer. Kretzer was stopped on U.S. Highway 166 waiting to turn left into Spears Manufacturing, where he worked. A witness observed a van driven by Salazar approaching Kretzer's stopped motorcycle from behind. The van made no attempt to stop and there were no skid marks at the scene. The van swerved at the last second but struck the motorcycle in the rear at a high velocity, throwing Kretzer into the air. The impact knocked off his helmet and he was found quite a distance from the motorcycle. Kretzer hit his head, which resulted in his death.

Montgomery County Sheriff's Deputy Phil Loveless responded to the call. When he arrived at the scene of the accident, he briefly spoke with Salazar at the ambulance where she was being evaluated. Salazar "seemed hysterical," and she was unable to tell Loveless her full name. She did say, however, that her driver's license was in the van, and she gave Loveless permission to retrieve it. Salazar was not arrested at the accident scene, and she was taken to the hospital for further evaluation.

Loveless and Sergeant Kyle Hand, also of the Montgomery County Sheriff's Office, went to the van to look for Salazar's driver's license or other identifying information. Hand was wearing a body camera that partially recorded the actions of the law enforcement officers. Loveless saw a cell phone lying on the driver's side floorboard, right below the driver's seat, and he picked it up. The evidence does not conclusively show whether Loveless pressed a button on the phone or whether he merely picked it up, but in any event, a text message conversation appeared on the phone's screen.

Hand said, "I'd put that up," and Loveless replied, "I was just trying to see if she was texting." Hand reached over and touched the phone's screen to minimize an image

that had been enlarged. In doing so, Hand saw that one of the text messages was time-stamped as having been sent at 7:41 a.m. Loveless noted that the current time was about 8:15 a.m., and he placed the phone into an evidence bag and put it into his patrol vehicle. Hand called the dispatcher and learned that the first call about the accident came in at 7:40 a.m. Later in the investigation, he learned that the clock on Salazar's cell phone was one minute different from the clock used by the dispatcher.

At some point later, Hand called Detective Lieutenant Chris Williams of the Montgomery County Sheriff's Office, and informed him that there had been a fatality accident involving a driver who "may have been on the phone prior to the accident." Williams went to the scene of the accident to help with the investigation.

Later that same morning, at about 11:30 a.m., Salazar was released from the hospital and Loveless gave her a ride to the sheriff's office where Williams interviewed her. The interview was videotaped but the DVD is not included in the record on appeal. According to Williams' testimony, Salazar was not under arrest during the interview and Williams told her that she was free to go at any time. Williams conducted the interview in an unlocked room. In the course of the interview, at 11:54 a.m., Salazar signed a written consent to allow a search of her cell phone.

Based on Salazar's consent, Williams looked through the cell phone and noted that a text message had been sent from the phone at about 7:41 that morning. When Williams asked Salazar about the text message, she admitted sending a text message while driving, but she believed she had sent it and placed the phone into the console before the accident. Salazar did not explain why she did not stop for the motorcycle and, according to Williams, Salazar "didn't really indicate that she had seen the motorcycle." Williams permitted Salazar to go home after he completed the interview.

6

Williams then applied for and obtained a search warrant for Salazar's cell phone. The search warrant application is not included in the record on appeal. However, the State contends and the district court found that the application for the search warrant included no information about Loveless' initial search of the cell phone. In his testimony, Williams explained that in a routine investigation of a fatality accident where a cell phone was found on the floorboard, he would apply for a search warrant to search the phone. But on cross-examination, Williams acknowledged that his office had no departmental policy about searching cell phones. Williams also admitted that he would not have been involved in this particular investigation had it not been for Hand's initial phone call.

On August 1, 2016, the State charged Salazar with one count of following another vehicle too closely; one count of failure to wear a seatbelt; one count of using a wireless communication device while driving to send or receive messages; and one count of vehicular homicide. The State summoned Salazar to appear to answer to the charges.

On April 2, 2017, Salazar filed a motion to suppress. In the motion, Salazar argued that Loveless' initial search of her cell phone was illegal, so any statements about her cell phone and any evidence discovered on her cell phone through that search or any later search should be suppressed.

The State filed its response on August 12, 2017. The State argued that Loveless "look[ed] at the phone attempting to find contact information for the defendant's family and stumble[d] upon incriminating evidence on the phone." The State also argued that the phone was searched again after obtaining Salazar's consent and that the attenuation doctrine applied to save the evidence discovered through later searches of the phone.

The district court held a suppression hearing on August 17, 2017, at which Hand, Loveless, and Williams testified for the State. The State also admitted into evidence the footage recorded by Hand's body camera at the scene of the accident. The State offered

7

the DVD of Williams' interview with Salazar and the prosecutor explained that the interview was relevant to whether the cell phone evidence was admissible under the attenuation doctrine. After a lengthy discussion between the court and counsel, the district court decided that it did not need to view the recorded interview and that the court would "reset the matter to make a determination as to whether or not the statements Ms. Salazar gave to Detective Williams were knowingly and voluntarily made."

On February 15, 2018, the district court issued its written order granting Salazar's motion to suppress. The district court found that "[w]hen Deputy Loveless touched the screen of [Salazar's] cell phone and it enlarged, he conducted a very brief search of the cell phone's contents." Because Loveless had neither Salazar's consent to search the phone or a valid search warrant for the cell phone, the district court found that the search was illegal. The district court also rejected the State's argument that the attenuation doctrine applied to allow the admission of the cell phone evidence later discovered by Williams. Specifically, the district court stated:

> "There was no intervening circumstance to justify the obtaining of the search warrant for the phone. *The police already knew the phone had damaging contents when the interview was conducted and the search warrant was obtained*.
>
> "The search warrant affidavit does not mention the deputy viewing the text message. However, the record is void of any intervening event that might make the phone admissible. It is not standard protocol for the Montgomery County Sheriff's Office to obtain search warrants after a fatality accident. *Detective Williams testified he would not have been involved absent talking to Deputy Hand about the phone. Thus, the Court can see no intervening event that would dissipate the taint.*
>
> "Moreover, Deputy Loveless, in the video and on the stand, testified he looked at the phone to see if the defendant was texting while driving. *Though it is clear Deputy Loveless did not intend to violate the defendant's rights, it is also clear the deputy was highly interested in the contents of the phone.* That interest should have been reduced to writing and a search warrant applied for if the contents were to become admissible. Otherwise, the conduct of the deputy looks flagrant." (Emphases added.)

8

The district court concluded that the "contents of the cellular phone seized in the captioned matter are determined to be inadmissible because they were retrieved in violation of [Salazar's] Fourth Amendment Rights." The State timely filed this appeal.

ANALYSIS

The State claims the district court erred by granting Salazar's motion to suppress. The State first argues that Loveless' initial search of the cell phone was legal under the plain view exception to the warrant requirement. The State also argues that even if Loveless' initial search was illegal, the attenuation doctrine applies to allow the admission of the evidence collected by Williams during his later searches of the cell phone. Finally, the State argues that this is not the type of situation to which the exclusionary rule should apply because doing so would not deter similar behavior by law enforcement.

In response, Salazar contends that the plain view exception does not apply to Loveless' initial, warrantless search of the cell phone. Salazar also contends that the attenuation doctrine does not apply to save Williams' later searches of the cell phone. Finally, Salazar contends that the district court properly applied the exclusionary rule and properly held that the evidence in question is inadmissible.

When reviewing a district court's decision on a motion to suppress evidence, an appellate court usually employs a bifurcated standard. *State v. Davis*, 306 Kan. 400, 416, 394 P.3d 817 (2017). The appellate court reviews the district court's factual findings for substantial competent evidence but does not reweigh evidence, resolve conflicting evidence, or reassess witness credibility. 306 Kan. at 416. The district court's decision whether to suppress the evidence is a question of law subject to de novo review. 306 Kan. at 416. Finally, the State bears the burden to establish that a search and/or seizure is lawful. K.S.A. 22-3216(2); *State v. Toliver*, 307 Kan. 945, 949, 417 P.3d 253 (2018).

9

The Fourth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, "protects everyone's right to be secure in his or her person and not subject to unreasonable searches by the government. Without a warrant, a search is unreasonable unless it falls within a recognized exception." *State v. James*, 301 Kan. 898, 908, 349 P.3d 457 (2015). The United States Supreme Court has held that a warrant is generally required before the search of a cell phone and that a cell phone, merely by virtue of its nature, is not exempt from the general warrant requirements. See *Riley v. California*, 573 U.S. ___, 134 S. Ct. 2473, 2493-94, 189 L. Ed. 2d 430 (2014). Thus, Loveless' initial, warrantless search of Salazar's cell phone was unreasonable unless a recognized exception to the warrant requirement applies. The State asserted to the district court and now on appeal that the plain view exception applies to justify Loveless' initial search of the cell phone.

*Plain view exception*

The plain view exception to the warrant requirement allows law enforcement officers to seize evidence of a crime without first obtaining a warrant when the evidence is in plain view of the officers performing lawful activities. *State v. Neighbors*, 299 Kan. 234, 252, 328 P.3d 1081 (2014). In order for the plain view exception to apply, the officer must be lawfully present at the location at which he or she views the evidence, "[a]nd the object's incriminating character must be immediately apparent without conducting some further search of the object." 299 Kan. at 252.

The district court did not explicitly address the State's plain view argument in its order granting the motion to suppress. But the district court expressly found that Loveless' initial search of the cell phone "was illegal under the Fourth Amendment to the United States Constitution." On appeal, the State contends that because the district court made no explicit finding that Loveless had, in fact, pressed a button on Salazar's cell phone before the text messages appeared on the screen, this court can find that Loveless

10

did not do so. Thus, the State argues, because Loveless was lawfully trying to locate Salazar's identifying information when he picked up the cell phone, and the text messages were immediately visible without further action by Loveless, the plain view exception excuses his warrantless search of the text messages.

Although the application of the plain view exception to the contents of a cell phone does not appear to have been addressed in Kansas, at least two federal district courts have applied the plain view exception to allow the admission of evidence that was visible on a cell phone screen and observed by law enforcement without manipulating the phone. See *United States v. Gomez*, 807 F. Supp. 2d 1134, 1141 (S.D. Fla. 2011) (finding information automatically displayed on cell phone by caller ID function admissible under the plain view exception after phone was lawfully seized by law enforcement); *United States v. Ramsey*, No. 17-cr-124, 2017 WL 4174525, *2 n.7 (D. Minn. 2017) (Facebook messages visible on a cell phone screen without any manipulation of the phone by the officer found admissible). Thus, while it appears that the plain view doctrine would apply if Loveless saw the text messages without manipulating Salazar's cell phone, the key issue here is whether the evidence supports such a finding.

The district court's lack of findings on this issue works against the State. Although the district court made no explicit factual finding that Loveless pressed a button on Salazar's cell phone before the text messages appeared on the screen, it did find the initial search illegal. When a district court fails to make a required factual finding and the parties do not object to the adequacy of the findings, an appellate court can presume the district court found all facts necessary to support its ruling. *State v. Dern*, 303 Kan. 384, 394, 362 P.3d 566 (2015). Because the district court's finding that Loveless' warrantless search of Salazar's cell phone was illegal necessarily means that the district court rejected the State's plain view exception argument, we can presume that the district court found that the messages did not simply appear on the phone without any action by Loveless. This implicit finding is supported by substantial competent evidence in the record.

11

Hand's narrative report reflected that he saw Loveless press a button on the cell phone, after which "the screen came on and was displaying a text message conversation." Hand also testified at the suppression hearing that he believed the text messages appeared after Loveless pressed the "home" button on the cell phone. For his part, Loveless testified at the suppression hearing that he did not remember whether he pressed the cell phone's home button when he picked up the cell phone. Although the body camera footage from the accident scene is recorded at an angle that does not reveal whether Loveless pressed any buttons on the cell phone, it does show Hand later telling another officer: "Her phone was on the floorboard, and we picked it up and hit—it was an iPhone, so we hit the home button and the first thing that pops up is a text message sent at 7:41. Dispatch got the call at around 7:40 according to her clock."

Thus, there is substantial competent evidence to support the district court's implicit finding that the text messages were not visible until after Loveless pressed the home button or otherwise manipulated the phone. In this situation, the plain view exception does not apply to save Loveless' warrantless search of Salazar's cell phone. As a result, we agree with the district court's ruling that Loveless' initial search of Salazar's phone was illegal under the Fourth Amendment to the United States Constitution.

*Attenuation doctrine*

Next, the State argues that the attenuation doctrine allows the admission of the cell phone evidence because Salazar later consented to the search of her phone, a search warrant was obtained for the phone, and a search was conducted that was sufficiently attenuated from the illegal search. Before discussing the attenuation doctrine further, we will examine some basic tenets of the exclusionary rule and some of its exceptions.

"The exclusionary rule is a judicially created remedy that prohibits the introduction of evidence obtained in violation of the Fourth Amendment in order to deter

12

future violations." *State v. Baker*, 306 Kan. 585, 590, 395 P.3d 422 (2017). The United States Supreme Court has explained:  "[T]he exclusionary rule encompasses both the 'primary evidence obtained as a direct result of an illegal search or seizure' and . . . 'evidence later discovered and found to be derivative of an illegality,' the so-called '"fruit of the poisonous tree."' [Citation omitted.]" *Utah v. Strieff*, 579 U.S. ___, 136 S. Ct. 2056, 2061, 195 L. Ed. 2d 400 (2016).

There are recognized exceptions to the exclusionary rule that allow the admission of evidence initially discovered in violation of a person's constitutional rights when the "'interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" *Strieff*, 136 S. Ct. at 2061. One such exception is known as the inevitable discovery rule. Another exception, at issue here, is the attenuation doctrine. 136 S. Ct. at 2061. Although the inevitable discovery rule and the attenuation doctrine are similar in some respects, there are important differences between these two exceptions to the exclusionary rule.

The inevitable discovery exception to the exclusionary rule allows the admission of otherwise unconstitutionally obtained evidence if police eventually would have found the evidence by lawful means. *Baker*, 306 Kan. at 590-91. For the exception to apply, the State must prove by a preponderance of the evidence that the evidence unlawfully seized would have ultimately been discovered by lawful means. 306 Kan. at 591. "[I]nevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment." *Nix v. Williams*, 467 U.S. 431, 444 n.5, 104 S. Ct. 2501, 81 L. Ed 2d 377 (1984). Stated differently, the State must prove by a preponderance of the evidence that the unlawfully seized evidence eventually *would* have been found by lawful means; not just that it *may* have been found by lawful means.

Here, the State has not argued that the cell phone evidence is admissible under the inevitable discovery rule; rather, the State argues that the evidence is admissible under

the attenuation doctrine. But for reasons we will explain, it appears from the district court's analysis in granting Salazar's motion to suppress that the district court conflated the attenuation doctrine with the inevitable discovery rule, and in doing so, engaged in analysis that is not germane to the attenuation doctrine. We will now turn to the proper analysis under the attenuation doctrine.

The United States Supreme Court recently explained the attenuation doctrine as follows: "Evidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.' [Citation omitted.]" *Strieff*, 136 S. Ct. at 2061. Stated differently, "'[u]nder the attenuation doctrine, courts have found that the poisonous taint of an unlawful search or seizure dissipates when the connection between the unlawful police conduct and the challenged evidence becomes attenuated.'" *State v. Moralez*, 297 Kan. 397, 409, 300 P.3d 1090 (2013).

Our Supreme Court has stated that "[w]hen evidence would not have come to light but for the illegal actions of the police, the relevant question is whether officers discovered the allegedly tainted evidence through exploitation of the illegal conduct or instead by means sufficiently distinguishable to be purged of the primary taint." *Moralez*, 297 Kan. 397, Syl. ¶ 10. "Whether the taint of illegal police conduct has been sufficiently purged through attenuation is a question of fact that appellate courts review under a substantial competent evidence standard." 297 Kan. 397, Syl. ¶ 11.

Citing *Brown v. Illinois*, 422 U.S. 590, 603-04, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975), the *Strieff* Court identified three factors that guide a court's analysis of whether the attenuation doctrine applies:  (1) The "'temporal proximity,'" or how closely the lawful discovery of evidence followed the unconstitutional search; (2) "'the presence of intervening circumstances'"; and (3) the "'the purpose and flagrancy of the official

14

misconduct.'" 136 S. Ct. at 2061-62. No one factor is controlling and despite the focus by the parties on these factors, the *Brown* Court did not limit the considerations involved in the attenuation doctrine to these factors, nor has the Kansas Supreme Court. See 422 U.S. at 603 (declining to adopt any "talismanic test" and cautioning that attenuation doctrine depends on the circumstances of each case); *Moralez*, 297 Kan. at 410 (finding other factors also may be relevant to the attenuation analysis). In any event, because the parties have limited their analysis to these three factors, we will do the same in this appeal.

*Temporal proximity*

The first factor generally considered by courts in an analysis under the attenuation doctrine is the "temporal proximity," or how closely the lawful discovery of evidence followed the unconstitutional search. *Strieff*, 136 S. Ct. at 2062. Stated differently, the first relevant factor under the attenuation doctrine is "the time that elapsed between the illegal conduct and the acquisition of the evidence sought to be suppressed." *Moralez*, 297 Kan. at 410. Here, the evidence Salazar seeks to suppress is the contents of her cell phone, including the text messages, later discovered by Williams with the search warrant following Salazar's consent to the search of her phone.

Although the district court acknowledged that temporal proximity is "generally considered" in an attenuation doctrine analysis, the district court did not further address this factor in its ruling on Salazar's motion to suppress. On appeal, Salazar states: "Loveless picked up the cell phone, pressed the home button, and immediately saw evidence in the form of a potentially incriminating text message. This could only have taken a few seconds." Thus, Salazar argues that the temporal proximity factor weighs against the application of the attenuation doctrine.

The State argues that the relevant time period is the time between the illegal search by Loveless and then Williams' later interview with Salazar that led to her giving consent

15

to search the cell phone and, ultimately, a warrant to search the cell phone. The State is correct. Under the circumstances of this case and the arguments made by the State both in the district court and on appeal, the relevant time frame began with Loveless' illegal search and ended with the later searches by Williams, after he first obtained Salazar's consent and then a search warrant.

Had Salazar consented to the search of her phone at the scene of the accident immediately after Loveless' illegal search, then under those circumstances the temporal proximity factor would have weighed against attenuation. But that is not what happened here. Loveless searched Salazar's cell phone at the van at about 8:15 a.m., and Salazar gave her written consent for Williams to search her cell phone at 11:54 a.m., after which Williams began the second search of Salazar's cell phone and saw the text messages already seen by Loveless during the illegal search. Later, Williams applied for and obtained a warrant to search the cell phone even further. Thus, over 3 hours and 30 minutes passed between the illegal search and the later searches that revealed the evidence now at issue. This period is the relevant time frame for the temporal proximity factor under a proper attenuation analysis.

*Presence of intervening circumstances*

The second factor that guides a court's analysis of whether the attenuation doctrine applies is the presence of any intervening circumstances. *Strieff*, 136 S. Ct. at 2062; *Moralez*, 297 Kan. at 410. As for this factor, the district court stated: "There was no intervening circumstance to justify the obtaining of the search warrant for the phone. The police already knew the phone had damaging contents when the interview was conducted and the search warrant was obtained." The district court also stated: "Detective Williams testified he would not have been involved absent talking to Deputy Hand about the phone. Thus, the Court can see no intervening event that would dissipate the taint."

16

The district court focused on the evidence that law enforcement already knew the phone had damaging contents when Williams interviewed Salazar and that Williams may not have been involved in the case had it not been for the initial illegal search of the phone. Although this analysis may have been applicable to the inevitable discovery rule, it is not controlling as to whether the attenuation doctrine applies. Under the attenuation doctrine, *how* Williams became involved in the investigation does not necessarily matter as long as the evidence shows that Salazar's later consent to the search of her phone and the search warrant application were not tainted by the initial illegal search. Likewise, whether law enforcement "already knew" about the text message by the time Salazar gave her consent for the search does not control. After all, the attenuation doctrine never comes into play until after law enforcement has engaged in some type of unconstitutional search or seizure. Thus, the district court erred in relying on these factors in finding that no intervening circumstances occurred to dissipate the taint of the initial illegal search.

Contrary to the district court's finding that "the record is void of any intervening event that might make the phone [evidence] admissible," a free and voluntary consent to a search *can* purge the taint of a Fourth Amendment violation if the later consent is so attenuated as to dissipate the initial taint. In *State v. Cleverly*, 305 Kan. 598, Syl. ¶ 11, 385 P.3d 512 (2016), our Supreme Court held:

> "An unconstitutional seizure may infect or taint a consent to search as well as any fruits of a law-enforcement-citizen encounter if the nature of the seizure renders the consent to search involuntary. Conversely, a voluntary consent to search can purge the primary taint of an illegal seizure where the connection between the lawless conduct of the law enforcement officer and the discovery of the challenged evidence has become so attenuated as to dissipate the taint."

Analysis of whether a person's consent was voluntary is crucial in determining whether the consent has sufficiently purged the taint of an illegal search or seizure. *Cleverly*, 305 Kan. at 613. "Generally, a valid consent requires: (1) clear and positive

17

testimony that consent was unequivocal, specific, and freely given, and (2) the absence of duress or coercion, express or implied." 305 Kan. at 613.

Here, the State presented evidence at the suppression hearing to suggest that Salazar voluntarily consented to Williams' search of her cell phone and that the consent was not tainted by the initial illegal search. Williams interviewed Salazar and obtained a written consent to search her phone more than three and a half hours after the accident. Williams described his interview with Salazar as a "voluntary contact." Salazar was not under arrest and Williams told her that she was free to go at any time. The interview took place in an unlocked room and Williams allowed Salazar to go home after the interview.

The problem we have in this case, however, is that the district court made no findings on whether Salazar's consent to search her cell phone was voluntary. The record of the suppression hearing reflects that the State offered the DVD of Williams' interview with Salazar and the prosecutor explained that the interview was relevant to whether the cell phone evidence was admissible under the attenuation doctrine. But after a lengthy discussion between the court and counsel, the district court decided that it did not need to view the recorded interview and that the court would reset the matter to make a determination about whether the statements Salazar gave to Williams, including her consent to the search of her phone, were knowingly and voluntarily made.

"The determination of 'whether a consent to a search was in fact "voluntary" or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances.'" *State v. Ryce*, 303 Kan. 899, 932, 368 P.34d 342 (2016). As already noted, when a district court fails to make a required factual finding, an appellate court can presume the district court found all facts necessary to support its ruling. *Dern*, 303 Kan. at 394. But "[w]hen faced with an incomplete record, an appellate court may remand for additional findings and conclusions." *Fischer v. State*, 296 Kan. 808, 825, 295 P.3d 560 (2013).

18

Here, the district court not only failed to make a finding on the voluntariness of Salazar's consent—a finding necessary to fully resolve the State's argument under the attenuation doctrine—the district court explicitly declined to consider the issue. Under these circumstances, this court cannot merely presume that the district court found all the necessary facts to support its ruling that the attenuation doctrine does not apply. And, as already stated above, this court does not make factual findings for the first time in the context of reviewing a ruling on a motion to suppress. See *Davis*, 306 Kan. at 416.

Resolving the voluntariness of Salazar's consent is critical to whether the attenuation doctrine applies to allow the admission of the cell phone evidence. Thus, we must reverse the district court's suppression order and remand for the district court to make findings on the voluntariness of Salazar's consent for the search of her cell phone and whether the consent may have been tainted by the prior illegal search. The district court must view Williams' recorded interview with Salazar to make this determination. The district court may consider additional evidence on this issue if requested by the parties since the court had stated it was going to "reset the matter" to make a later determination about whether Salazar's statements to Williams were voluntary. If the district court finds that Salazar's consent for the search of her cell phone was voluntary, then it should reconsider whether the consent was a valid intervening circumstance that serves to dissipate the taint of the initial illegal search.

Likewise, the district court should reconsider whether the later search warrant was an intervening factor in favor of attenuation. In its order suppressing the evidence, the district court acknowledged that the "affidavit supporting the search warrant does not mention [Deputy Loveless] viewing the text message." Still, the district court concluded that there was no intervening circumstance to justify the search warrant because law enforcement already knew the phone had damaging contents when the search warrant was obtained and Williams may not have been involved in the case had it not been for the

19

initial illegal search of the phone. The district court also found that it was not standard protocol for the sheriff's office to obtain search warrants after a fatality accident.

Again, although this analysis may have been applicable to the inevitable discovery rule, it is not controlling as to whether the attenuation doctrine applies. Under the attenuation doctrine, the focus is on whether the initial illegal search of the phone tainted the later search warrant application or whether the connection between the two events was so attenuated that the primary taint had been removed. Williams testified that the search warrant application was based in part on the information he found on the phone after Salazar signed the consent. So whether Salazar's consent was voluntary and not tainted has a bearing on whether the later search warrant application is a valid intervening circumstance that serves to dissipate the taint of the initial illegal search. The district court should reconsider this issue on remand.

*Purpose and flagrancy of the official misconduct*

The third factor that guides a court's analysis of whether the attenuation doctrine applies is the "purpose and flagrancy of the official misconduct." *Strieff*, 136 S. Ct. at 2062; *Moralez*, 297 Kan. at 410. As for this factor, the district court stated:

> "Deputy Loveless, in the video and on the stand, testified he looked at the phone to see if the defendant was texting while driving. Though it is clear Deputy Loveless did not intend to violate the defendant's rights, it is also clear the deputy was highly interested in the contents of the phone. That interest should have been reduced to writing and a search warrant applied for if the contents were to become admissible. Otherwise, the conduct of the deputy looks flagrant."

On appeal, the State argues that the mere fact that Loveless did not apply for a search warrant of the phone does not somehow render his conduct flagrant. The State also

20

argues that the district court's finding that Loveless did not intend to violate Salazar's constitutional rights undermines its finding that Loveless' conduct "looks flagrant."

The State's arguments have merit. In *Strieff*, the Supreme Court emphasized that "[f]or the violation to be flagrant, more severe police conduct is required than the mere absence of proper cause for the seizure." 136 S. Ct. at 2064. The Kansas Supreme Court has stated that in examining the flagrancy of official misconduct, "'[f]actors such as an officer's regular practices and routines, an officer's reason for initiating the encounter, the clarity of the law forbidding the illegal conduct, and the objective appearance of consent may all be important in this inquiry.'" *Moralez*, 297 Kan. at 416.

Here, Loveless indicated the investigatory design of his actions, stating, "I was just trying to see if she was texting." On the other hand, Salazar had given permission for Loveless to enter her car to retrieve her identification. The illegal search of the cell phone was brief in duration, and it is unclear whether Loveless knew that his conduct was likely unconstitutional but engaged in it anyway. All Hand said to him was "I'd put that up." All these factors are relevant to the purpose and flagrancy of the official misconduct.

The district court essentially found that just because Loveless was interested in the cell phone and searched it without a warrant, his conduct "looks flagrant." But because every instance of the attenuation doctrine involves an initial illegality, such a conclusory analysis of flagrant conduct renders the attenuation doctrine almost meaningless. Also, the district court's finding on flagrancy was inconsistent with the court's observation that "it is clear Deputy Loveless did not intend to violate the defendant's rights." On remand, the district court should reevaluate its finding on the purpose and flagrancy of the official misconduct based on all the evidence presented and the relevant factors for consideration.

To sum up, we reverse the district court's suppression order and remand for further proceedings to allow the district court to conduct the proper analysis under the

21

attenuation doctrine and to reevaluate the admissibility of the cell phone evidence. The district court must address and make appropriate findings on whether Salazar's consent to the search her cell phone was voluntary. The district court must view Williams' recorded interview with Salazar and may consider additional evidence on this issue if requested by the parties. In analyzing whether the cell phone evidence is admissible under the attenuation doctrine, the district court should first consider the time that elapsed between Loveless' initial illegal search of the cell phone and Salazar's later consent to the search of her phone. Next, if the district court finds that Salazar's consent was voluntary, then it should reconsider whether her consent was a valid intervening circumstances in favor of attenuation. The district court should also reconsider whether the later search warrant was an intervening factor that serves to dissipate the taint of the initial illegal search. Finally, the district court should consider the purpose and flagrancy of the official misconduct, as well as any other factors relevant to the proper analysis under the attenuation doctrine.

Reversed and remanded with directions.